534 F.Supp.2d 1290 (2008)
LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,
v.
AVENTURA ENGINEERING & CONSTRUCTION CORP., Cary O. Lopez, Camille A. Davis, and Rosaline Williams, Defendants.
No. 06-22494-CIV.
United States District Court, S.D. Florida.
January 8, 2008.
*1291 *1292 Edward Etcheverry, Esq. & Guy Harrison, Esq., & Jeffrey Geller, Esq., Plantation, FL, for Plaintiff.
Vincent Vaccarella, Esq., & John Moore, Esq., Aventura, FL, for Defendants.
ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING PLAINTIFF'S RENEWED AND SUPPLEMENTAL EMERGENCY MOTION FOR PRELIMINARY INJUNCTION; DENYING AS MOOT PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; CLOSING CASE
ALAN S. GOLD, District Judge.
THIS CAUSE is before the Court on: (1) Plaintiff's Motion for Summary Judgment [DE 101]; (2) Plaintiffs Motion for Preliminary Injunction [DE 113]; and (3) Plaintiffs Renewed and Supplemental Emergency Motion for Temporary Restraining Order with Notice and for Preliminary Injunction [DE 116]. The parties have filed responses and replies, and oral argument on these motions was held on November 20, 2007 and on December 20, 2007. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 based on the parties diversity of citizenship.
Having reviewed the parties' arguments and the relevant case law, I conclude that Plaintiffs Motion for Summary Judgment seeking: (1) a judicial declaration that Plaintiff had the right to settle Aventura's claim against Goodwill, based on Aventura's breach of the Indemnity Agreement; (2) a monetary judgment in the amount of $2,755,936.51 to indemnify Plaintiff for losses and costs incurred in connection with the Goodwill Bond, with the Court reserving jurisdiction to determine Plaintiffs entitlement to recover interest, additional costs, and attorneys' fees; and, (3) a final decree of specific performance requiring *1293 that Defendants post collateral in the amount of $1,015,000.00 to secure Plaintiff against potential liability on the Village of Pinecrest Bond and the pending claim by Jag-Air Mechanical in connection with the Silver Lakes School Payment Bond, must be granted in its entirety. Based on the entry of summary judgment, I further conclude that Plaintiff is entitled to an All Writs Act Injunction to restrain Aventura and the American Arbitration Association ("AAA") from proceeding with the pending arbitration proceeding styled Aventura Engineering & Construction Corp, v. Goodwill Industries of Southern Florida, Inc., AAA Case No. 32410-Y-00500-06 (the "Arbitration Action"), Finally, because I granted summary judgment on Plaintiffs request for a final decree of specific performance, Plaintiffs Motion for Preliminary Injunction: (1) seeking to disgorge improperly received payments from the School Board of Broward County, Florida, in the amount of $163,628.00 in relation to the Silver Lakes Middle School Project; and, (2) requiring Defendants to post collateral in the additional amount of $411,372.00 to cover the potential losses and expenses associated with the pending claim on the Silver Lakes Bond by Jag-Air Mechanical, is denied as moot.

I. Factual Background
The following material facts are undisputed and supported by evidence in the record.[1]
Liberty Mutual Insurance Company ("Liberty") is a Massachusetts corporation which, among other things, issues surety bonds. Defendant Aventura Engineering & Construction Corp. ("Aventura"), a Florida Corporation, is a general contractor in the construction industry. Defendants Cary O. Lopez ("Lopez"), Camille A. Davis ("Davis"), and Rosaline Williams ("Williams") are citizens and residents of the state of Florida.
A. The General Indemnity Agreement
On or about December 4, 2003, Defendants Aventura, Lopez, Davis, and Williams (collectively "Defendants", "Indemnitors", or "Principals") executed an Indemnity Agreement in favor of Liberty. (Plaintiffs Revised Statement of Undisputed Facts, DE 143 at ¶ 1). The execution of the Indemnity Agreement was a condition precedent to Liberty issuing the bonds discussed in Section LB of this Order on behalf of Aventura, (Id., at ¶ 6).
Although relevant parts of the Indemnity Agreement, a copy of which has been filed with the Court,[2] are addressed in the substantive argument section of this order, certain key provisions are set forth below.
SECOND: INDEMNITY  The Indemnitors shall exonerate, hold harmless, indemnify, and keep indemnified the *1294 Surety from and against any and all losses, fees, costs and expenses whatsoever kind or nature . . . from the date of a breach of this Agreement or a breach of any other written agreements between or for the benefit of the Surety and the Indemnitor(s) and/or Principal(s) (hereinafter referred to as "Other Agreements") . . . which the Surety may sustain or incur: (1) by reason of being requested to execute or procure the execution of any Bond; or (2) by having executed or procured the execution of any Bond; (3) by reason of the failure of the Indemnitors or Principals to perform or comply with any of the covenants and conditions of this Agreement or Other Agreements; or (4) in enforcing any of the covenants and conditions of this Agreement or Other Agreements. Payment . . . shall be made to the Surety by the Indemnitors . . . promptly, upon demand by the Surety, whether or not the Surety shall have made any payment therefore and, at the Surety's sole option, irrespective of any deposit or collateral. If the Surety determines, in its sole judgment, that potential liability exists for losses and/or fees, costs and expenses for which the Indemnitors and Principals will be obliged to Indemnify the Surety under the terms of this Agreement or Other Agreements, the Indemnitors . . . shall deposit with the Surety, promptly upon demand, a sum of money equal to an amount determined by the Surety or collateral security of a type and value satisfactory to the Surety, to cover that liability, whether or not the Surety has: . . . (b) made any payments; or (c) received any notice of any claims thereof. . . . In the event of any payment by the Surety, the Indemnitors . . . further agree that in any accounting between the Surety . . . and the Indemnitors . . . the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement or Other Agreements under the belief that it is, or was, or might be labile for the sums and amounts so disbursed or that it was necessary or expedient to make to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.
THIRD: ASSIGNMENT  The Indemnitors hereby consenting do assign, transfer, pledge and convey to the Surety . . . as collateral security for the performance of the covenants and agreements herein contained, contained in Other Agreements and for the payment of any other indebtedness or liability of the Indemnitors and/or Principals to the Surety, whether therefore or hereafter incurred, the assignment in the case of each contract being effective as of the date of the Bond covering such contract the following: (a) all of the right, title and interest of the Indemintors and/or Principals in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any matter out of the Bonds; . . . (d) all actions, causes of action, claims and demands whatsoever which the Indemnitors and/or Principals may have or acquire against any subcontractor, laborer or materialrnan, or any person furnishing *1295 or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and au con; tracts referred to in the Bonds; . . .
FIFTH: TAKEOVER  In the event of any, of the following: breach, default, or termination asserted by the obligee in any Bond; any Principal's abandonment of the work or forfeiture of any contract covered by any Bond, any Principal's failure to pay obligations incurred in connection therewith; . . . then the Surety shall have the right at its option and its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or under the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by the Bonds, and the Indemintors hereby agree to use their best efforts to cause the Principal to permit the Surety to take possession of any part or all of the work . . ., at the expense of the Indemnitors and Principal, to complete or arrange for the completion of the same, and the Indemnitors and Principals shall promptly, upon demand, pay to the Surety all losses, fees, costs and expenses so incurred.
THIRTEENTH: SETTLEMENTS  Surety shall have the right, at its option and sole discretion, to adjust, settle or compromise any claim, demand, suit or judgment upon any Bond, unless any indemnitor or Principal providing a reasonable legal basis thereof, shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount to be used in paying any judgment or judgements rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.
EIGHTEENTH: ATTORNEY-INFACT  The Indemnitors and Principals hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the full right and authority, but not the obligation, to exercise all the rights of the Indemnitors and" Principals assigned, transferred and set over to the Surety in this Agreement, with full power and authority to execute on behalf of and sign any Indemnitor or Principal to any . . . release, . . . or any other document or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement. The Indemnitors and Principals hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact and agree to protect and hold harmless the Surety for acts herein granted as attorney-in-fact.
TWENTIETH: AMENDMENTS  This Agreement may not be cluinged or modified orally. No change or modification shall be effective unless made by written amendment to form a part thereof.
B. The Goodwill Bond
In reliance upon the rights conveyed by the Indemnity Agreement, Liberty issued the following contract performance and payment bonds on behalf of Aventura: (1) Payment and. Performance Bond No. 964-004-212 in favor of Goodwill Industries of *1296 South Florida, Inc. (owner/obligee) in connection with the Goodwill Miami Facility Expansion Project (hereinafter, the "Goodwill Bond"); (2) Payment and Performance Bond No. 964-004-221 in favor of Crompton Construction (owner/obligee) in connection with the Pre-Demolition American Airlines Project; (3) Payment and Performance Bond No. 964-007-923 in favor of Broward County School Board (owner/obligee) in connection with the Silver Lakes Middle School Project (hereinafter, the "Silver Lakes Bond"); (4) Payment and Performance Bond No. 964-007-925 in favor of Broward County School Board (owner/obligee) in connection with the Attucks Middle School Project (hereinafter, the "Attucks Bond"); (5) Bid Bond No. 964-004-212 in favor of Village of Pinecrest (owner/obligee) in connection with the Library/Community Center Project (hereinafter, the "Pinecrest Bond"); (6) Payment and Performance Bond No. 964-004-236 in favor of American Airlines, Inc. (owner/obligee) in connection with the Relocation for MDAD Ramp Control Tower North Terminal Project; (7) Payment and Performance Bond No. 964-004-278 in favor of Turner-Austin American Airlines, and Miami-County Dade (owner/obligee) in connection with the Interior Finish, North Terminal at MIA Project; (8) Payment and Performance Bond No. 964-007-927 in favor of Miami-Dade County Park and Recreation Department (owner/obligee) in connection with the Interior Homestead Air Reserve Project. (Id. at ¶ 7).
On or about September 9, 2004, Aventura entered into a contract with Goodwill for the construction of a Goodwill facility (the "Goodwill Project"). (Defendants' Statement of Material Facts, DE 150 at ¶ 1). Section 4.6 of the contract included an arbitration clause for dispute resolution. (Id. at ¶ 1). On September 29, 2004, pursuant to the Indemnity Agreement, the parties executed Thee American Institute of the Architects standard performance bond document, Document A312, as the Performance Bond in favor of Goodwill for the Goodwill Project. (Id. at ¶ 2).
On April 8, 2006, Aventura sent Goodwill's architect a letter advising it of increased costs that Aventura was requesting as a change order to the project. (Id. at ¶ 3). On April 12, 2006, Goodwill responded by notifying Liberty and Aventura that Goodwill was invoking § 3.1 of the Goodwill Bond, which required a meeting between the parties when Goodwill is considering declaring a contractor default. (DE 143 at ¶ 8). On April 20, 2006, Aventura sent Goodwill a follow-up letter to the April 8th letter providing an additional breakdown of the amounts of money and time Aventura was requesting, and showing that the increase was due to price escalations due to the impact of the hurricanes and the construction boom, as well as a bid mistake. (DE 150 at ¶ 5). On May 4, 2006, representatives from Goodwill, Aventura, Liberty and Sousa Architecture, P.A. met to discuss Goodwill's intention of declaring Aventura in default. At that meeting, it was agreed that Aventura would continue its performance as the project was already ninety percent completed. (Id. at ¶ 6).
In a letter dated May 23, 2006, Goodwill informed Aventura and Liberty that it was "extremely disappointed" with the lack of progress on the project since the parties had met on May 4, 2006 and, as a result, was once again demanding that Liberty take whatever action was necessary to complete the project on an expedited matter. (See DE 107-3, Ex. 5). In response to this letter, Liberty conducted a review of Aventura's books and records, including *1297 those of the Goodwill Project and asked Goodwill to continue the pre-termination meeting process under § 3.1 of the Bond for two more weeks, to allow the parties time to develop a proposal for completion of the work. (DE 143 at ¶ 9, & n. 7). After the books and records review, Aven. tura provided Liberty a handwritten analysis showing that AventM.a calculated the costs to complete at $900,000.00 over the existing contract balance held by Goodwill. (Id. at ¶ 9). This amount did not include general conditions of $40,000 a month or any allowance for non-compliant work. (Id.). In addition, Liberty discovered letters from Aventura to Goodwill in which Aventura admitted that it under-bid the project by approximately $1.7 million. (Id. at ¶ 9; DE 107 at Ex. 10). During this time, Goodwill did not pay the April and May Payment Applications. (DE 150 at ¶ 7). On June 1, 2007, Aventura's counsel wrote to Goodwill advising that it was in default of their payment obligations under their agreement. (Id. at ¶ 8).
In a letter dated June 5, 2006, Libertydemanded that Aventura post $900,000.00 in collateral to cover what Liberty estimated to be its potential exposure with regard to the Goodwill Bond. (DE 143 at ¶ 10; DE 107 at Ex. 11). The letter stated that Liberty wanted to meet with Aventura to discuss the status of the Goodwill Project and the steps necessary to complete it. (DE 107 at Ex. 11). In addition, the letter stated: "This letter is written under a full reservation of all rights and defenses available to Liberty under its Bond, its General Agreement of Indemnity, any other contract, at law or in equity." (Id.). On June 9, 2006, Liberty provided Defendants with Liberty's detailed calculations justifying the collateral amount demanded, which was based on the projected deficit of the project. (DE 143 at 10; DE 107, Ex. 12 & 13).
In a different letter, also dated June 9, 2006, Aventura provided Liberty with a counter-proposal. (DE 107 at Ex. 14). In the June 9 letter, Aventura alleged that it had not yet been terminated, that it had not been declared in default, and it did not think there was any justification for Liberty to have any involvement with the matter. (Id.). The counter-proposal included a statement that Aventura would agree to "collateral assignment of a security interest in the building but at a number to be agreed based upon a further analysis of the financial numbers on the Project." (Id.). Furthermore, the counter-proposal required Goodwill to release all funds due under the April and May pay applications to Aventura directly and not as joint checks. (Id.). Finally, Liberty was required to issue performance and payment bonds for the Village of Pinecrest Project. (Id.).
Several other letters and emails were exchanged between Aventura and Liberty regarding the demand for collateral on the Goodwill Bond. Liberty's demands continued through October 5, 2006, the date this lawsuit was filed. The seven additional written demands were made on June 20, June 30, July 7, July 11, July 25, September 14, and October 4, 2006. (DE 143 at ¶ 11, n. 13). Each demand included "a full reservation of all rights and defenses available to Liberty under its Bond, its General Agreement of Indemnity, any other contract, at law or in equity." (See DE 104 at Ex. 20-24, 27, 29). The Inderrmitors did not provide the demanded collateral.[3]
On June 19, 2006, Goodwill terminated Aventura's contract for an alleged default and made a demand on Liberty to perform the contract pursuant to the Performance *1298 Bond. (DE 143 at ¶ 8). The letter demanding Liberty to perform stated that Goodwill had already complied with § 3.1 of the Performance Bond, and provided Aventura seven days to cure its default (DE 39 at ¶ 11, & Ex. 3; DE 143 at ¶ 10).[4] Aventura had continued to perform work pursuant to the contract and to fully man the project until it was terminated on June 19, 2006. (DE 150 at ¶ 9).
On June 20, pos, Aventura formally demanded that Liberty not honor Goodwill's claim against the Bond, and that Liberty allow Aventura to litigate its claim against Goodwill. (DE 143 at ¶ 18). Aventura did not accompany the demand with any type of collateral.[5] (Id.).
On June 20, 2006, Aventura's counsel wrote to Goodwill's attorney alleging that *1299 Goodwill was in default of the contract, that its termination was improper, and requesting that Goodwill withdraw its termination letter and that it pay the outstanding pay applications. (DE 150 at ¶ 18). On that same date, Aventura initiated arbitration proceedings against Goodwill for an alleged wrongful termination and seeking over $3,000,000.00 in damages. (DE 150 at ¶ 19, 25). Also on June 20, 2006, Aventura's counsel wrote to Liberty advising them that Goodwill was in default of the contract for failure to pay Aventura the April and May Pay Applications, totaling $558,328.10; that its termination was wrongful; that Goodwill had failed to comply with the notice and cure provisions required by the construction contract; and requesting that Liberty deny Goodwill's request that Liberty complete the project, (DE 150 at 520).[6]
Section 12.4 of the performance bond defines "Owner Default" as "Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof,"[7] (Goodwill. Performance Bond, DE 152-8). Liberty does not dispute that. Goodwill owed at least one payment at the time that it declared that Aventura was in default. (DE 150 at ¶ 16).
In response to Aventura's and Goodwill's allegations of default, Liberty requested Aventura's cooperation in getting the subcontractors to agree to continue to perform and to ratify their contracts and also requested that Aventura provide the assistance of its personnel in the completion of the work. (Id. at ¶ 26). On July 12, 2006, Liberty and Goodwill, negotiated and drafted a Takeover Agreement (the "Takeover Agreement"), to which Aventura was not a party.[8] (Affidavit of Cary Lopez, DE 56-4 at Ex. 13). In the Takeover Agreement, Liberty proposed to complete the Goodwill *1300 project under a complete reservation of rights. (DE 143 at ¶ 21). Specifically, the Takeover Agreement provided:
8. Reservation of Rights. This Agreement is being entered into under a complete reservation of rights by all parties, and the parties agree that the Surety's election to perform the Project under the Performance Bond shall not be construed as an admission of liability under the Performance Bond, or admission of Aventura's default under the Contract or a waiver of Aventura's claims thereunder. The Surety's decision to perform the Contract is for mitigation purposes only.
14. No Third Party Beneficiaries. This Agreement is solely for the benefit of the Owner and the Surety. The Owner and the Surety do not intend by any provision of this Agreement to create any rights in or increase the rights of any thirdparty beneficiaries, nor to confer any benefit upon or enforceable rights under this Agreement or otherwise upon anyone other than the Owner and the Surety.
After the Takeover Agreement was executed, Aventura continued to assist Liberty to complete the project. (DE 150 at ¶ 28). This assistance included providing Liberty with Aventura personnel and documents, as well as reviewing subcontractor invoices. Aventura also executed a partial release of lien in favor of Goodwill on August 16, 2006, so that Goodwill would pay Liberty $305,509.50 in contract proceeds, so that Goodwill could release a payment to Liberty. (Id.).
Subsequent to the Takeover Agreement, Liberty made a demand upon Aventura for collateral and indemnity that Aventura thought was excessive. (Id. at ¶ 29). Aventura countered and requested proof of the amounts that Goodwill was claiming and proof that the amounts did not include extra change order work that was not within Aventura's scope of work. (Id.).[9]
Liberty's written communications with Defendants, both before and after the Takeover Agreement, stated that Liberty continued to reserve all rights under the Indemnity Agreement and that nothing about Liberty's actions could be deemed a waiver of or estoppel against those rights. On August 3, 2007, Liberty informed the Indemnitors, in writing, that among the rights Liberty reserved was the right to execute release documents using the Indemnity, Assignment, Settlements, and Attorney-in-Fact provisions of the Indemnity Agreement. (DE 107-10 at Ex. 38).
By November of 2006, Liberty had incurred substantial expenditures to complete the Goodwill project. (DE 143 at ¶ 19). As a result, Liberty made a series of demands for indemnification and proposals to resolve the indemnity obligations *1301 of the Defendants. (Id.). On November 13, 2006, Liberty formally declared the Indemnitors in default under the Indemnity Agreement due to their continued fail tire to post collateral. (DE 143 at ¶ 24 & EX. 32). In the default letter, Liberty formally invoked the assignment, right to settle and power of attorney provisions, (DE 107 at Ex. 32). The letter once again stated that Liberty was reserving all rights and defenses and informed the Indemnitors that Liberty would exercise its ownership of and right to settle Aventura's affirmative claim against Goodwill as part of Liberty's overall settlement with Goodwill on the claim against the Performance Bond. (DE 107 at Ex. 32). Defendants did not paid Liberty any amount for indemnification of Liberty's losses, costs, and expenses, nor did they post any collateral.
On January 9, 2007, Liberty executed a Settlement Agreement with Goodwill. (DE 39 at Ex. 7-8). As part of the Settlement Agreement, Liberty exercised its power-of-attorney to execute a release of all claims that Aventura had against Goodwill growing out of the bonded contract.[10] (Id.). Liberty has provided evidence showing it has incurred damages, including completion costs, investigative costs, and attorney's fees, in the amount of $2,755,936.51 as a result of issuing the Goodwill Bond. (DE 143 at ¶ 27). At the December 20 Hearing, Defendants conceded that Liberty has incurred these expenses.
C. The Pinecrest Bond
On June 21, 2007, the Village of Pinecrest, Florida, made a demand on the Pinecrest Bond. (DE 143 at ¶ 12). The sum of the Bond is $336,970 (5% of Aventura's "Bid). Liberty's potential exposure is the full amount of the Bond, plus potential interests, costs, and attorneys' fees. (Id.). In a letter dated July 25, 2006, Liberty made a demand for collateral in the amount of $1.4 million: $336,970 demand by the Village of Pinecrest, and an allowance for Liberty's continuing and projected investigation and completion expenses on the Goodwill Bond. (DE 107 at Ex. 24). On September 14 and October 4, 2006, Liberty again made formal written demand upon the Indemnitors for posting of the Pinecrest Bond collateral. (Id. at Ex. 27 & 29). The Indemnitors have not posted the demanded collateral. To this date, Liberty remains uncollateralized against any alleged loss with regard to the Village of Pinecrest claim in the amount of $440,000. (DE 143 at ¶ 26).
D. The Claim by Jag-Air Against the Silver Lakes Payment Bond
On September 5 and 23, 2007, Liberty received a claim in the amount of $525,437.94.18 on Payment Bond No. 964-007-923, for the Silver Lakes School project, from Jag-Air Mechanical (the "Jag-Air Claim"), Aventura's HVAC subcontractor. (DE 103 at p. 6 & Ex. A). On September 7, 2007, and again on October 4, 2007, Liberty demanded collateral in the amount of $575,000.00 as security against the potential liability on the Silver Lakes. Bond, including potential claims for interest, costs and attorneys' fees. (DE 103 at p. 7 & Ex. B). Aventura terminated Jag-Air on September 5, 2007 at the express written *1302 direction of the School Board of Broward County, the owner of the Silver Lakes project. (DE 150 at ¶ 46). The Indemnitors have not responded to Liberty's demand for collateral on the Silver Lakes Bond, and have not posted collateral in any amount. (DE 143 at ¶ 17). Liberty remains uncollateralized against its alleged loss with regard to the Jag-Air claim in the amount of $575,000. (Id. at 26). No collateral has been posted with Liberty.

II. Standard for Summary Judgment
Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim. See id. ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly precludes the entry of summary judgment."). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252, 106 S.Ct. 2505; Bishop v. Birmingham Police Dep't, 361 F.3d 607, 609 (11th Cir.2004).
The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Celotex v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. Anderson, 477 U.S. at 248, 106 S.Ct. 2505; Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir.2001).
In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party. Denney, 247 F.3d at 1181. In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255, 106 S.Ct. 2505.

III. Applicable Law
This case is before me on diversity grounds pursuant to 28 U.S.C. § 1332; therefore, Florida choice-of-law rules apply. See Attorney's Title Ins. Fund, Inc. v. Regions Bank, 491 F.Supp.2d 1087, 1093 (S.D.Fla.2007) ("Florida law indisputably governs the substantive issues in a case where the federal court's jurisdiction is based on diversity of citizenship."); Mazzoni Farms v. E.I. Dupont De Nemours & Co., 166 F.3d 1162, 1164 (11th Cir.1999) (applying Florida's choice-of-law rules in a diversity case). Neither the Indemnity Agreement nor the Performance Bond contain a choice-of-law clause; however, since both agreements were executed in Florida for work to be performed in Florida, under Florida choice-of-law rules, Florida substantive law applies. Morgan Walton *1303 Prop. v. Int'l City Bank & Trust Co., 404 So.2d 1059, 1061 (Fla.1981) ("Florida's established rule for choice of law governing the validity and interpretation of contracts looks to the law of the place of contracting and the law of the place of performance.").
The Eleventh Circuit has explained that in diversity cases, "[i]n the absence of definitive guidance from the Florida Supreme Court, we follow relevant decisions from Florida's intermediate appellate courts." State Farm Fire & Cas. Co. v. Steinberg, 393 F.3d 1226, 1231 (11th Cir. 2004) (citing 17A James Wm. Moore, et al., Moore's Federal Practice § 124.22[3]. 124-87, 124-88). Florida District Courts of Appeal are the law of Florida unless and until overruled by the Florida Supreme Court. Pardo v. State, 596 So.2d 665, 666 (Fla.1992). Thus, "[a] federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." Silverberg v. Paine, Webber, Jackson & Curtis, Inc., 710 F.2d 678, 690 (11th Cir.1983) (citations omitted). Only "[i]n the absence of precedents from Florida's intermediate appellate courts . . . may [we] consider the case law of other jurisdictions that have examined similar [issues]." State Farm Fire, 393 F.3d at 1231. The objective is for the Federal Court to determine the issues of state law as it believes the Florida Supreme Court would. While neither the Florida Supreme Court nor Florida's intermediate appellate, courts have spoken definitively on ill the issues before me, Florida cases that generally discuss the rights and obligations of sureties and contractors guide my decision in this case.
Courts nationally, as well as, in Florida, have recognized the vital role of sureties in the construction industry. See, e.g., Gen. Accident Ins. Co. of Am. v. Merritt-Meridian Constr. Corp., 975 F.Supp. 511, 516 (S.D.N.Y.1997) ("Sureties enjoy such discretion to settle claims because of the important function they serve in the construction industry, and because the economic incentives motivating them are a sufficient safeguard against payment of invalid claims."). Therefore, if a surety is called upon to discharge an obligation of one of its principals, it may enforce several common law rights, including its right to exoneration, quia timet, subrogation, contribution, and common law indemnity. See Am. Surety Co. v. Lewis State Bank, 58 F.2d 559, 560-561 (5th Cir.1932).[11] As the former Fifth Court explained, "[a] surety is indeed a favorite of equity, which will "extend its aid in exoneration, quia timet, before he pays, and will subrogate him after he pays, liberally and fully, as against others primarily liable on the debt." Id. at 560.
In addition to these rights, as a precondition to issuance of its, bonds, sureties often require that the principal execute a written indemnity agreement which memorialize, enhance and supplement its common law rights. See BRUNER AND HALEY, MANAGING AND LITIGATING THE COMPLEX SURETY CARE, 121 (American Bar Association, 2d Ed.2007). Sureties draft their indemnity agreements broadly, and with extensive protections, and the courts, understanding the importance of the indemnity agreement, consistently enforce the *1304 agreements and the remedies granted to the sureties. See, e.g., The Revenue Markets, Inc. v. Amwest Surety, 35 F.Supp.2d 899 (S.D.Fla.1998) (enforcing the broad provisions of the indemnity agreement), aff'd in part, reed in part, 204 F.3d 1121, 209 F.3d 722, 204 F.3d 1121, 209 F.3d 725; see also, Thurston v. Int'l Fidelity Ins. Co., 528 So.2d 128, 129 (Fla. 3rd DCA 1988) ("A surety is entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a good faith belief that it was required to pay, regardless of whether any liability actually existed."); Employers Ins. of Wausau v. Able Green, Inc., 749 F.Supp. 1100, 1103-1104 (S.D.Fla. 1990) (holding that similar indemnity provisions were not unconscionable and noting that other courts had consistently upheld such provisions in general indemnity agreements); Gen. Accident Ins. Co. of Am., 975 F.Supp. at 516 ("Sureties enjoy such discretion to settle claims because of the important function they serve in the construction industry, and because the economic incentives motivating them are a sufficient safeguard against payment of invalid claims."); United States Fid & Guar. Co. v. Feibus, 15 F.Supp.2d 579, 584 (D.Pa.1998) ("Sureties enjoy such discretion to settle claims because of the important function they serve in the construction industry. The purpose of good faith clauses is to facilitate the handling of settlements by sureties and protect them from unnecessary and costly litigation.").
The Supreme Court has found that "suretyship is not insurance." Pearlman, v. Reliance Ins. Co., 371 U.S. 132, 140 n. 19, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). Similarly, the Florida Supreme Court has described a suretyship
as a contractual tripartite relationship in which one party (the surety) guarantees to another party (the obligee) that a third party (the principal) will perform a contract in accordance with its terms and conditions. The surety promises the obligee to answer the debt, default, or miscarriage of the principal. Suretyship is a form of guaranty. In exchange for a premium, the surety lends its financial strength and credit to the principal on the condition that, if the surety has to satisfy the principal's debt or default, the principal will indemnify the surety for its losses, and expenses. In essence, the surety becomes the guarantor of the principal's ability to perform its obligations to the obligee. Given this description, it is reasonable to conclude that an owner/obligee, by requiring that a bond be obtained by the principal, is essentially insuring itself from potential losses that would result in the event the principal defaults on its obligations required by the underlying construction contract.
Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co., 945 So.2d 1216, 1226 (Fla. 2006) (internal quotations omitted); see also, Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd., 593 So.2d 195, 198 (Fla. 1992) ("The surety agrees to complete the construction or to pay the obligee the reasonable costs of completion if the [principal] defaults."); W. World Ins. Co. v. Travelers Indem. Co., 358 So.2d 602, 604 (Fla. 1st DCA 1978) ("The usual view, grounded in commercial practice, [is] that suretyship is not insurance. . . . The surety on a bond is lending its credit to make certain, if the conditions of the bond are violated, that the aggrieved party will be protected in the event the principal is financially unable to comply with the conditions of the bond. If the principal can satisfy the obligation, the surety need not respond. The surety, unlike the liability insurer, however, is entitled *1305 to be indemnified by the one who should have performed the obligation.").
The Florida Legislature and Florida Courts have recognized the importance of sureties in the construction business. For example, persons wishing to enter into a formal contract with the state or its subdivisions for the construction of a public work are required to execute, deliver, and publicly record a payment and a performance bond with a surety insurer, See § 255.05(2), Fla. Stat. (1995). Although Florida law does not require private developers and contractors to acquire these bonds, almost all of them do. See Transamerica Ins. Co. v. Barnett Bank of Marion County, N.A., 540 So.2d 113, 115 (Fla. 1989) ("Because of their importance, payment and performance bonds are mandatory under section 255.05 for government projects and are commonly employed by prudent private owners."). Furthermore, Florida courts have recognized that the "purpose of a surety [is] to protect the obligee," and that the surety has a right to protect itself. Id. at 116; see also Auto-Owners Ins. Co. v. Se. Floating Docks, Inc., No. 05-334-31, 2007 WL 676217, *3, 2007 U.S. Dist. LEXIS 14252, at *8 (M.D.Fla. March 1, 2007) ("[T]he surety on the one hand has to act in the best interests of the insured, and on the other hand it obviously has self-interest and can legitimately protect that self-interest."). With these principles in mind, I will apply the majority rule on the issues raised which the Florida courts have not addressed, unless such rule does not comport to the principles discussed herein.

IV. Motion for Summary Judgment
In its Motion for Summary Judgment, Plaintiff seeks: (1) entry of a final declaratory judgment that Liberty had the right to settle Aventura's claim against Goodwill; (2) entry of a monetary judgment in the amount of $2,755,936.51 against all Defendants, jointly and severally, with the Court reserving jurisdiction to determine Liberty's entitlement to recover interest, additional costs and attorneys' fees; and, (3) entry of a permanent injunction requiring all. Defendants, jointly and severally, to provide Liberty with cash collateral in the amount of $1,015,000.00 to secure Liberty against potential liability as a result of having issued bonds on behalf of Aventura, namely the Pinecrest and Silver Lakes Bonds.
A. Liberty's Right to Release Aventura's Claim
Liberty argues that Aventura breached the Indemnity Agreement by failing to provide collateral upon demand, by demanding that Liberty deny Goodwill's claim without providing security to Liberty, and by failing to provide any indemnification to Liberty. According to Liberty, these breaches triggered Liberty's right to the assignment of Aventura's claim against Goodwill, to settle that claim in order to procure Liberty's release of any further liability to Goodwill, and to act as Aventura's attorney-in-fact for purposes of executing any necessary documents to effectuate the benefit of receiving the claim.
Aventura responds that Liberty did not have the right to settle Aventura's claim against Goodwill because: (1) Goodwill did not have a proper claim under the Performance Bond because it was in default of its contract with Aventura; (2) that the Settlements provision (§ 13) of the Indemnity Agreement is limited to claims against the Bond, and the Attorney-in-Fact provision (§ 18) is limited to rights assigned elsewhere in the Indemnity Agreement; *1306 and, alternatively, (3) if Liberty was authorized to settle Aventura's claim, Liberty waived such rights; and, (4) Liberty's bad faith vitiates any right, otherwise not waived, to release Aventura's claim. Defendants further argue that Liberty cannot be awarded summary judgment on Count I, seeking a declaration of Liberty's right to settle and release Aventura's claim against Goodwill, because it failed to join Goodwill and the Architect, both of which, according to Defendants, are indispensable parties. I conclude that Defendant's arguments are unavailing for the reasons discussed below.
1. Right-to-Settle Clauses
A right-to-settle clause provides a surety with wide discretion in settling claims, even where the principal is not liable for the underlying claim. Auto-Owners Ins. Co., No. 05-334, 2007 WL 676217 at* 5. In fact, it is a well settled principle that a surety may settle claims regardless of whether liability for the claim actually existed, Thurston, 528 So.2d at 129, and for the sole purposes of avoiding the cost of litigation. See generally, Employers Ins. of Wausau, 749 F.Supp. at 1103 (surety's decision to forgo litigation and settle claims is not evidence of bad faith where litigation would far exceed the expense fo settling the claims).
While neither the Florida Supreme Court, Florida intermediate courts of appeals, nor the Eleventh Circuit have addressed the specific question of whether the surety may, in addition to settling a claim on the bond, also settle the principal's claims against the owner of the bond, other courts that have done so have expressly recognized a surety's right to settle the principal's claims, by virtue of the assignment and power-of-attorney provisions of an indemnity agreement. See, e.g., Hutton Constr. Co. v. County of Rockland, 52 F.3d 1191 (2d Cir.1995) (affirming trial court's decision, to enforce a settlement which included the surety's dismissal of its principal's affirmative claims, over the principal's objections). The Hutton Court reasoned that the principal breached the indemnity agreement by failing to make the demanded indemnity payments. Id. at 1192. This breach triggered the assignment clause and caused assignment of to the surety of all of the principal's rights growing out of the construction contracts. Id. The assignment clause, and the attorney-in-fact clause, which unambiguously appointed the surety as the principal's attorney-in-fact with the power to exercise all rights assigned to them, gave the surety the right to settle the principal's claims against the owner. Id. 1192-93.
Similarly, in Mezzacappa Brothers, Inc. v. City of New York, No. 03-0223, 2003 WL 22801429, *6-7 (S.D.N.Y. Nov.24, 2003), the Court Rand that the assignment provision in the indemnity agreement, which stated that "[Principal] assigns to [Surety] . . . [a]ny actions, causes of action, claims or demands whatsoever which [Principal] may have or acquire against any party to the Contract, or arising opt of or in connection with any Contract . . . and [Surety] shall have the full and exclusive right, in its name or in the name of [Principal] . . . to prosecute, compromise, release or otherwise resolve such actions, causes of action, claims or demands," gave the surety the authority to release and settle the principal's affirmative claims. Id.; see also, Bell BCI Co. v. Old Dominion Demolition Corp., 294 F.Supp.2d 807, 812 (E.D.Va.2003) (applying Virginia Law and finding that the Indemnity Agreement's unambiguous assignment and attorney-in-fact *1307 provisions conferred on the Surety the authority to settle and resolve the principal's claims against the owner); Herlandle Indep. School Dist. v. C2M Const., Inc., No. 04-07-00304, 2007 WL 2258510, *2 (Tex.App. Aug.8, 2007) (finding that the industry standard[12] indemnity, assignment, settlement, and attorney in fact provisions give the surety the right to settle principal's claims against the project owner); North Am. Specialty Ins. Co. v. Montco Constr. Co., Inc., No. 01-0246E, 2003 WL 2138321, at *7 (W.D.N.Y. April 25, 2003) (finding that a principal's breach of indemnity agreement by failing to post collateral or otherwise exonerate the indemnity surety activated the attorney-in-fact and assignment clauses of the Indemnity Agreement and gave the surety the right to settle the principal's pending lawsuit against the owner/obligee). Courts that have addressed this question answer it by construing the, language of the Indemnity Agreement to ascertain the surety's rights and obligations. See id.
These cases are consistent with Florida's cardinal rule of contract construction which is ". . . to ascertain the intention of the contracting parties and to give effect to that intention if it can be done consistently with legal principles." J.A. Jones Constr. Co. v. Zack Co., 232 So.2d 447, 449-450 (Fla. 3rd DCA 1970). "To ascertain the real intent, the language used, the subject-matter, and the purpose designed may be considered. When the purpose designed to be accomplished is ascertained, e meaning and effect given to the language used should comport with the intended purpose." Id. When a contract is clear, complete, and unambiguous, no judicial construction is necessary. Jenkins v. Eckerd Corp., 913 So.2d 43, 50 (Fla. 1st DCA 2005); Maher v. Schumacher, 605 So.2d 481, 482 (Fla. 3rd DCA 1992) ("When a contract is clear and unambiguous, the actual language used in the contract is the best evidence of the intent of the parties, and the plain meaning of that language controls."). Applying this fundamental principle of Florida law, consistent with the Hutton case and its progeny, it is clear and unambiguous that the Indemnity Agreement in this case clearly provides that when the surety faces potential liability under any of the issued bonds, it has the right to be exonerated and indemnified. (Indemnity Agreement, DE 33-2 at § 2).
The Indemnity provision provides that Liberty has the right to be exonerated and indemnified for all costs it sustains by, *1308 among other things, being requested to execute the Bond or in enforcing the covenants of the agreement. (Id.). The Indemnity Agreement further provides that the Indemnitors assign to the Surety, for performance of the covenants in the agreement, all "right, title, and interest . . . in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any matter out of the Bonds." (Id. at § 3). Further, the Settlements provision gives the surety "the right, at its option and sole discretion, to adjust, settle or compromise any claim, demand, suit or judgment upon any Bond, unless any indemnitor . . . providing a reasonable legal basis . . . shall request the Surety to litigate such claim or demand . . . and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety." (Id. at § 13) (emphasis added). Finally, the Attorney-in-Fact provision "irrevocably . . . appoint[s] . . . the Surety as their attorney-in-fact with the full right and authority . . . to exercise all the rights of the Indemnitors and Principals assigned, transferred and set over to the Surety in this Agreement, with full power and authority to execute on behalf of and sign any Indemnitor or Principal to any . . . release, . . . or any other document or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement." (Id. at § 18).
Read together, these provisions give Liberty the right, at its option and sole discretion, to settle or compromise any claim or demand upon any Bond. If Aventura wants to protect its claims against the owner of the bonds, the Indemnity Agreement sets forth a mechanism that allows it to do so: it must first ask Liberty to deny the claim, and, at the same time, it must provide Liberty with collateral that exonerates and indemnifies it against any potential loss. Although Aventura was given multiple opportunities to do so, and was even warned that failure to do so would result in Liberty settling Aventura's claim against Goodwill, Aventura chose to ignore the demands and never posted collateral. As in Hutton, this breach of the Indemnity Agreement, coupled with Goodwill's demand on the Bond, triggered all of Liberty's rights under it. Applying Florida rules of contract construction consistent with Hutton, I conclude that the Florida Supreme Court would adopt the reasoning in Hutton and hold that the Indemnity Agreement, through the Assignment, Settlements, and Attorney-in-Fact provisions, gave Liberty the right to release Aventura's claims against Goodwill.
2. Goodwill's Claim under the Performance Bond
Defendants urge this Court to read the Goodwill Performance Bond in conjunction with the Indemnity Agreement and argue that the Indemnity Agreement provides that Liberty's rights arise only if Goodwill can make a valid claim under the Performance Bond. According to Defendants, § 3 of the Performance Bond provides that Goodwill can only make a claim upon the bond if there is "no Owner Default." Specifically, the Goodwill Performance Bond provides:
If there is no Owner Default, the Surety's obligation under this Bond shall arise after:
3.1 The Owner has notified the Contractor and the Surety . . . that the Owner is considering declaring a Contractor *1309 Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract.[13] If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default.
3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such. Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have, received notice as provided in Subparagraph 3.1; . . .
The Definitions section of thee Performance Bond defines:
Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply, with the terms of the Construction Contract.
and,
Owner Default: Failure of the Owner, which has neither been remedied or waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.
Defendants argue that because. Goodwill had not paid the April and May pay applications, it was in default of the construction contract and could not make a proper claim on the bond. According to Defendants, because Aventura had declared Goodwill in default, the rights Liberty negotiated for in the Indemnity Agreement, including the Assignment (§ 3), Settlements (§ 13), and the Attorney-in-Fact (§ 18) provisions, could not properly be invoked. Defendants' argument fails for several reasons.
Under Florida law, the indemnity agreement, and not the performance bond, delineates the rights and obligations of a principal and surety. See Aetna Ins. Co. v. Buchanan, 369 So.2d 351, 354 (Fla. 2d DCA 1979) ("The status of an indemnitor of a surety on a bond is to be determined by the indemnity, agreement and not by the provisions of the bond."); Harrison v. Am. Fire & Cas. Co., 226 So.2d 28, 29 (Fla. 4th DCA 1969) (rejecting the argument that an indemnitor's liability shall be fixed by the terms of the bond since the status of an indemnitor is governed by the indemnity agreement, not the bond); see also, Gen. Accident Ins. Co. Of Am., 975 F.Supp. at 517 ("[A] contractor, whose relationship with the surety is governed by an express indemnity agreement contract containing provisions that permit the surety to settle in good faith, may [not] avoid its obligation to indemnify by pointing to inconsistent provisions in a separate contract between itself and the subcontractor.").
Moreover, courts nationally have recognized that the difference between the right to indemnity under the common law and the right to indemnity under a general indemnity agreement is that, "[a]bsent a written indemnity agreement, the surety's common law indemnity rights exist only when there is actual liability . . . however, there will usually exist a written indemnity agreement between the parties, which will *1310 typically provide, among other things, that the surety need only show potential liability or that it believed in good faith that it was necessary or expedient to satisfy a claim to invoke its rights." BRUNER, p. 120.
a. Receipt of a "valid" claim is not a precondition on the Indemnity Agreement
Contrary to Defendants' assertions, the Indemnity Agreement does not condition Liberty's rights on a "proper" or "valid" claim upon the Bond. Instead, Liberty and Aventura executed an Indemnity Agreement giving Liberty the right to seek collateral in order to be exonerated and to be indemnified for all costs associated with the issued bonds. The Indemnity provision states that if the "Surety determines, in its sole judgment, that potential liability exists" the principals must deposit a sum of money satisfactory to the Surety, regardless of whether the Surety has made any payments or even received a notice of a claim on the bond. (Indemnity Agreement, DE 33-2 at § 2) (emphasis added). The Settlements provision gives the surety "the right, at its option and sole discretion, to adjust, settle or compromise any claim [or] demand . . ." (Id. at § 13) (emphasis added). The Assignment provision assigns "all of the right, title and interest of the Indemnitors and/or Principals in, and growing in any manner out of, all contracts referred to in the Bonds, or . . . out of the Bonds." In turn, the Attorney-in-Fact provision appoints the Surety as Defendants' "attorney-in-fact . . . to exercise all the rights . . . assigned . . . over to the Surety . . . in this Agreement, with full power and authority to execute on behalf of and sign any Indemnitor or Principal to any . . . release . . . ".
Nowhere in these provisions does the Indemnity Agreement require that the owner's claim on the bond be "valid" before Liberty may exercise its contractual rights to indemnity, exoneration, assignment and settlements of claims. Rather, these provisions unequivocally state that Liberty's rights arise once Liberty determines that it may incur potential liability and that actual liability need not be shown. Cf. Thurston, 528 So.2d at 129 ("A surety is entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a good faith belief that it was required to pay, regardless of whether any liability actually existed."). Therefore, whether Goodwill's claim is ultimately found to have been "proper" or "valid" is immaterial. The Indemnity Agreement simply does not provide that Liberty must receive a valid claim before it can exercise its rights.[14]
Additionally, Defendants' assertion that there was an Owner Default because Goodwill did not pay the April and May applications is of persuasive. The Performance Bond defines an Owner Default as "Failure *1311 of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction: Contract . . ." (Goodwill Performance Bond, 152-8) (emphasis added). It also defines "Contractor Default" as the "[f]ailure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract." The Construction Contract has not been submitted, and the issue of whether an Owner Default actually occurred is not before me. However, the undisputed facts indicate that Goodwill was considering declaring a Principal/Contractor Default prior to Adventure declaring it in default. Aventura's formal demand asking Liberty not to honor Goodwill claims was actually submitted a day after Goodwill had formally declared Aventura in default. At that time, Liberty was already aware that Goodwill did not believe Aventura had complied with the Construction Contract. Whether Goodwill was required to make the April and May payments under these circumstances is not clear. What is clear, however, is that demonstrating that Goodwill's claim on the bond was "valid" is not a precondition to Liberty's exercise of its right to be exonerated.
b. Goodwill's formal demand on the Bond for an alleged breach by Aventura.
Defendants do not dispute that Goodwill declared a Contractor/Principal Default and that Liberty received a claim by Goodwill demanding that Liberty complete the project. The undisputed facts also establish that Liberty conducted a review of Aventura's books and records and determined that Aventura had underbid the project by approximately $1.7 million. Given the findings of the review and Goodwill's formal demand on the Bond, Liberty was facing potential liability under the Goodwill Bond. Thus, under the clear terms of the Indemnity Agreement, Liberty had the right to demand collateral from Aventura. Despite the unambiguous language of the Indemnity Agreement, which requires that if the indemnitors request that the surety dispute the claim, the principals "shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety . . . to be used in paying any judgment or judgements rendered or that may be rendered . . .", Indemnity Agreement, § 13, the indemnitors did not post the demanded collateral. Once Adventura breached the Indemnity Agreement, Liberty had the right to settle Aventura's claim against Goodwill.
Defendants also argue that Liberty may not unilaterally decide if an, actual breach of the construction contract has occurred. I find this argument to favor Plaintiff's position: not only can it not conclusively decide if an actual breach of the construction contract  a contract it is not a party to  has occurred, but Plaintiffs were under no obligation to do so. What the Indemnity Agreement provides is that if Plaintiffs determine that potential liability exists, it can protect itself by invoking the broad provisions of the agreement it bargained for.
Defendants' argument is also flawed because it ignores the fact that the Indemnity Agreement does not require that there be an actual default for the broad provisions of the Indemnity Agreement to take effect. The undisputed facts establish that both Goodwill and Aventura declared each other in default and both looked to the Surety to protect their rights. A reasonable surety would objectively conclude that it faced potential liability under the bond. *1312 To protect itself, it requested collateral from the indemnitors. Once the indemnitors breached the Indemnity. Agreement by failing to indemnify and exonerate Liberty, the Assignment, Settlements, and Attorney  in-Fact provisions were triggered.
c. The Performance Bond does not limit Liberty's rights
Finally, the interpretation that Defendants urge this Court to adopt would place the surety in a "lose-lose situation." In this case, the principal claimed that the owner was in default and asked the surety not to honor the owner's claim on the bond, and, at the same time, the owner claimed that the principal was in default and turned to the surety under the terms of the bond. This situation places the surety in an unacceptable dilemma: if it does not honor the claim on the bond, the owner sues the surety and the surety incurs the cost of litigation and of a potential judgment. On the other hand, if the surety honors or settles the claim on the bond, the principal sues under a bad faith theory in an attempt to avoid its obligation to indemnify the surety and the surety once again has to absorb, or at least advance, the cost of the litigation and a potential judgment.[15] This lose-lose situation is not a reasonable interpretation of the Indemnity Agreement or the Bond. A more reasonable interpretation is consistent with what happened in this case (as established by the undisputed facts).
Once Liberty was informed that both parties were alleging a default, Liberty reviewed Aventura's books and records and determined that the best course of action was to negotiate a takeover agreement, authorized under § 5 of the Indemnity Agreement, to minimize its potential losses. Liberty then gave Aventura multiple opportunities to post collateral and litigate its claims against Goodwill, but Aventura chose not to comply with the clear terms of the Indemnity Agreement and instead expected the Surety to unilaterally absorb the risks of completing the project and of not settling with Goodwill. The Indemnity Agreement provides that the Indemnitors will exonerate the Surety from all potential liability  this provision unequivocally evidences the Surety's intent to be protected from any loss, even if temporary, it could potentially face. Having to wait until after an arbitration panel or a court determines which of the two parties, the principal or the owner, is in default is simply not a viable legal option.
The Indemnity Agreement was drafted to protect the surety from this very situation by not requiring that there be actual liability for the rights of the surety to arise. I cannot reasonably read the Bond, the terms of which have not been incorporated into the Indemnity Agreement, to modify and minimize the rights Liberty carefully sought to establish in the agreement. There would be no incentive for sureties to issue bonds if they could be put in a situation like the one Aventura wishes Liberty to be in. For these reasons, and noting that there are no material facts in dispute, I conclude as a matter of law that *1313 the Indemnity Agreement defines the rights and obligations of the parties, and that Liberty's rights under the Indemnity Agreement arose once it reasonably determined that it was facing potential liability under the Goodwill Bond.
3. The Assignment and Settlement of Aventura's Claims under the Indemnity Agreement
Defendants further argue that the Indemnity Agreement did not provide for the assignment of Aventura's claim against Goodwill, nor did it give Liberty the right to settle such claims because the Assignment provision (§ 13) of the Indemnity Agreement is limited to claims against the Bond, and the Attorney-in-Fact provision (§ 18) is limited to rights assigned elsewhere in the Indemnity Agreement. More specifically, Defendants argue that the Settlements provision is limited to claims against the Bond and that Liberty attempted to release a claim against Goodwill, the bond owner. They also argue that the Assignment provision only assigned causes of actions directed against subcontractors, laborers and materialmen. To support this argument, Defendants rely on the fact that the Assignment provision (§ 3) is divided into four categories and only 3(d), discussing claims against subcontractors, laborers and materialmen, assigns "actions, causes of actions, claims, and demands." In contrast, sections 3(a)(c), discussing contracts and subcontracts under the Bond, only assigns "right, title, and interests." Finally, Defendants argue that the Attorney-in-Fact (§ 18) provision is limited to other rights assigned else where in the Indemnity Agreement and, because the Assignment provision does not assign "causes of actions" against Goodwill, Liberty cannot settle these claims. This argument is circular and without merit as it contradicts the plain language of the Indemnity Agreement.
Recently, a Texas Court of Appeals considered the same argument Defendants present in this case, under provisions nearly identical[16] to the ones in this case, and found the argument meritless. See Harlandale Indep. Sch. Dist. v. C2M Constr., Inc., No. 04-07-00304, 2007 WL 2253510, 2007 Tex.App. LEXIS 6242 (Tex.App. Aug. 8, 2007). In Harlandale, C2M, the principal, argued that the indemnity agreement contained a specific provision assigning causes of actions which the contractor may have or acquire against any subcontractor, and a separate and different provision assigning, rather than the causes of actions, all the rights of the contractor in and to all subcontracts. Just like the Defendants in this case, C2M argued that if the causes of actions arising out of the construction contract were meant to have been included in the assignment provision, then the indemnity agreement would have contained a separate and specific provision assigning those causes of actions rather than a general provision assigning only the "rights" of the contractor in the construction contract. The Harlandale Court was unconvinced and stated: "[t]he language in the indemnity agreement assigning the rights in and to all subcontracts; however, is not as broad as the language assigning all rights `in, and growing in any manner out of the construction contract'. Because the breach of contract claim grows or arises out of the construction contract, the assignment to the Sureties included that claim." Id., 2007 WL 2253510, *3, 2007 Tex.App. LEXIS 6242 at * 9 (citing Hutton Const. Co., 52 F.3d at 1192 and North *1314 Am. Specialty Ins. Co., 2003 WL 21383231, at *7).
Here, as in the Harlandale case, the language "all of the right, title and interest of the Indemnitors and/or Principals in, and growing in any manner out of the Bonds" is broader and includes claims and causes of actions arising out of those contracts. It follows, then, that if Aventura's claims and causes of actions were assigned under the Assignment provision of the Indemnity Agreement, the Attorney-in-Fact provision designates Liberty as Aventura's Attorney-in-Fact and allows it to settle and release those claims.[17] For these reasons, I conclude that the Florida Supreme Court would follow and apply the rationale of Harlandale to the undisputed facts of this case.
4. Waiver
In the alternative, Defendants argue that even if Liberty was authorized to settle Aventura's claim, Liberty waived such rights through the execution of the Takeover Agreement and related correspondence.[18] For purposes of this discussion, the two pertinent provisions of the Takeover Agreement provide that:
Reservation of Rights. The Surety's election to perform the Project under the Performance Bond shall not be construed as an admission of liability under the Performance Bond, or admission of Aventura's default under the Contract or waiver of Aventura's claims thereunder. The Surety's selection to perform the Contract is an accommodation for mitigation purposes only . . . [T]he surety acknowledges that Aventura disputes the default allegations and any damage claim, and has valid claims and/or defense against the Owner . . . In particular, should a court of competent jurisdictions or arbitration panel determine that the Contractor did not default under the Contract, the Surety shall be entitled to recover its completion costs and other damages against the Owner.
and,
No Third Party Beneficiaries. This Agreement is solely for the benefit of the Owner and the Surety. The Owner and the Surety do not intend by any provision of this Agreement to create any rights in or increase the rights of any third-party beneficiaries, nor to confer any benefit upon or enforceable rights under this Agreement or otherwise upon anyone other than the Owner and the Surety.
In addition, Aventura argues that Liberty waived its right to settle Aventura's claim in correspondence from its counsel. First, on June 20, 2006, Liberty's counsel sent an email stating that it wanted to discuss whether Aventura would agree to cooperate in the completion of the project "under a full reservation of rights towards Goodwill." Second, on July 5, 2006, Liberty's counsel email to Aventura stated:

*1315 "I saw from email. . . . that you had an issue with the reservation of rights [in the Takeover Agreement] . . . The reservation of rights is simple  everyone reserves their claims, but Goodwill gets a completed building as overseen by Liberty and under the conditions of the Takeover Agreement If people want to litigate whether the termination of Aventura was wrongful, . . . or vice-versa on Goodwill's breach of contract claim against Aventura and Goodwill, then that will happen later. Everyone reserves all rights and defenses so no one's position is prejudiced." (emphasis added).
Florida law defines "`waiver' as the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right." Raymond James Fin. Servs. v. Saldukas, 896 So.2d 707, 711 (Fla.2005). As a matter of Florida law, a waiver requires proof of conduct demonstrating a clear intent to relinquish a known right, and as such, a waiver must be knowing, intelligent and voluntary. Alston v. Alston, 960 So.2d 879, 881 (Fla. 4th DCA 2007) ("As a matter of law, waiver requires knowledge of facts and intentional conduct"); Costello v. Curtis Bldg. P'ship, 864 So.2d 1241, 1244 (Fla. 5th DCA 2004) ("Waiver is the intentional relinquishment of a known right. In order to constitute waiver, the party's conduct must establish clear relinquishment, and while conduct can imply waiver, the conduct relied upon to do so must make out a clear case of waiver.").
The record on summary judgment in this case does not establish, as a matter of law, that Liberty knowingly, intelligently and voluntarily relinquished any of its rights under the Indemnity Agreement. As to the Takeover Agreement, even if the Reservations Provision could be read to infer a waiver, the No Third Party Beneficiary Provision clearly indicates that Liberty did not intend to waive its rights against Defendants or any other parties. In addition, both prior to and following the execution of the Takeover Agreement, Liberty continued to reserved "all rights and defenses available to Liberty under its Bond, its General Agreement of Indemnity, any other contract, at law or in equity."
Similarly, neither the June 20th or July 5th emails sufficiently waived Liberty's rights. In fact, the July 5th email specifically stated that "everyone reserves their claims," meaning the Liberty reserved its claims against Aventura as well. The email also stated that "Everyone reserves all rights and defenses so no one's position is prejudiced," which indicates that Liberty did not intend to be prejudiced by waiving its rights under the Indemnity Agreement. The only reasonable interpretation of these emails is that the status quo was preserved  Aventura reserved its claim against Goodwill, which was later assigned to Liberty as a result of Aventura's breach by not posting the demanded collateral. In conclusion, the entirety of the record contradicts any plausible argument that Liberty knowingly, intelligently and voluntarily relinquished any of its rights. There is simply no sufficient record, evidence demonstrating a knowing, intelligent and voluntary waiver of Liberty's rights. Cf. Hutton, 52 F.3d at 1193 (because the surety had reserved its rights under the agreement on four occasions, the principal could not "argue that the Sureties waived their rights . . . or that [it] had not notice the Sureties might assert their rights.").
5. Whether Liberty acted in Bad Faith so that it Vitiated any Right to Release Aventura's Claim
Defendants also contend that Liberty did not act in good faith when it acted on *1316 Goodwill's demand despite Goodwill's alleged default, by agreeing to complete the project and to permit. Aventura to arbitrate the issue of wrongful termination, and then revoking the agreement and executing a release. Liberty responds that it did not act in bad faith, and that Aventura's failure to post the demanded collateral negates any claim of bad faith. It is undisputed that Defendants did not post the required collateral in order arbitrate its claim. As discussed more fully below, this failure to comply, with the clear terms of the Indemnity Agreement defeats, as a matter of law, Defendants' claim of bad faith.
Courts have consistently upheld contractual rights of a surety as long as the surety acted in a good faith belief that it was required to act or pay, regardless of whether any liability actually existed. See Employers Ins. of Wausau, 749 F.Supp. at 1103 (applying Florida law and holding that a surety is entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a good faith belief that it was required to pay, regardless of whether any liability actually existed). To prove bad faith, the indemnitor must show that the surety acted with deliberate malfeasance, which, "by definition, is an intentional wrongful act which the actor has no legal right to do, or any wrongful conduct which affects, interrupts, or interferes with the performance of official legal duty." Id. Therefore, a "lack of diligence or negligence is not the equivalent of bad faith, and even gross negligence is not the same as bad faith." Id. The majority of other states have similarly held that bad faith requires a showing that the surety acted fraudulently or with ill-will. See generally AU. Contr. & Material Co. v. Ulico Cas. Co., 380 Md. 285, 319-20, 844 A.2d 460 (Md.2004) (discussing the majority view that a surety has breached its duty of good faith only when it acted with an improper motive); Gen. Accident Ins. Co. of Am., 975 F.Supp. 511 (finding that a decision to proceed with claims despite possible defenses, is not evidence of bad faith); but cf. Atl. Contr. Material Co. v. Ulico Cas. Co., 380 Md. 285, 320, 844 A.2d 460 (Md. 2004) ("Other courts . . . have concluded that, even if there is no evidence of fraud or ill-will, the surety has fallen short of its goodfaith duty by unreasonably or negligently paying an obligee's claim on the bond.").
In addition, several courts have held that a principal's failure to post collateral defeats the defense of bad faith. See, e.g., Employers Ins. of Wausau, 749 F.Supp. at 1102-1103 (allegation of bad faith cannot withstand indemnitors' breach by failing to post collateral); Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 721 (5th Cir.1995) (concluding that the surety did not settle in bad faith a disputed claim that was being litigated when the principal failed to post the collateral which would have prevented the surety from settling with the bond obligee); Gen. Accident Ins. Co. of Am., 975 F.Supp. 511 (settling disputed claims after indemnitors failed to post collateral defeats finding of bad faith); United States Fid. & Guar. Co. v. Feibus, 15 F.Supp.2d 579, 585 (M.D.Pa.1998) (concluding, that "Defendants ignored repeated requests by the plaintiff to provide collateral security, in violation of a surety agreement, weighs against a finding that the surety acted in bad faith in settling claims.").
The record on summary judgment contains no evidence that Liberty acted inappropriately (let alone create an issue of material fact in that regard). First, Defendants *1317 do not deny that Liberty reviewed Aventura's books and records, and concluded that the project had been significantly underbid. Thus, Defendants' conclusory allegations that Liberty did not adequately investigate every claim and defense asserted by Aventura prior to honoring Goodwill's claim does not support a, finding of bad faith as a matter of law. Cf. Auto-Owners Ins. Co., No. 05-334, 2007 WL 676217,* 4, n. 2 (S.D.Fla. March 1, 2007).
Second, the undisputed record evidence establishes that Liberty negotiated the Takeover Agreement in order to mitigate its losses. Establishing that a surety settled a claim in order to protect its interest does not support a finding of bad faith, specially since the recognized purpose of a surety is to protect the owner of the bond and not the principal. See, e.g., Transamerica Ins. Co. v. Barnett Bank of Marion. County, N.A., 540 So.2d 113, 116 (Fla. 1989) (recognizing that the purpose of a surety is to protect the owner of the bond); Auto-Owners Ins. Co., No. 05-334-31, 2007 WL 676217, *3, 2007 U.S. Dist. LEIS 14252 at *8 (recognizing that sureties have has self-interests that it can legitimately protect).
Third, the uncontroverted summary judgment evidence establishes that Defendants breached the Indemnity Agreement by failing to provide the demanded collateral. Despite this breach, Liberty continued to provide Defendants with opportunities to post the collateral and arbitrate its claims. As clearly outlined in their agreement, if Aventura wanted to arbitrate it claims, all it had to do was post the requested collateral. Only once it became apparent that Aventura would not comply with the provisions of the Indemnity Agreement did Liberty declared it in default and proceeded to negotiate with Goodwill in an attempt to minimize its potential exposure. Since Aventura ignored its obligations under the Indemnity Agreement, it cannot now complaint of the harsh result of Liberty's decision to settle the claim. Cf. Feibus, 15 F.Supp.2d at 585 (concluding that evidence that a surety settled a claim despite the principal's allegations that the owner was in default could not establish bad faith when the principal ignored numerous requests to post collateral). As a matter of law, there cannot be a finding of bad faith when an indemnitor fails to post the contractually required collateral. Cf. Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 721 (5th Cir.1995) (concluding that a surety did not act in bad faith by settling a claim that the principal was litigation because principals did not take the necessary steps, as described in the indemnity agreement, to prevent the surety from settling with the obligees). In sum, Defendants have not offered any summary judgment evidence supporting their conclusionary allegations of bad faith. On the other hand, Liberty's uncontroverted summary judgment evidence demonstrates that Liberty exercised its rights under the Indemnity Agreement in good faith, by settling with the obligee once Defendants breached the Indemnity Agreement by not posting collateral.
6. Whether Goodwill and the Architect are Indispensable Parties
The last argument Defendants put forth is that Liberty cannot be granted summary judgment because of its failure to join Goodwill and the project's architect. According to defendants these parties are indispensable because a declaration that Liberty had the right to release Aventura's claims against them impacts their rights. Plaintiff has not responded to Defendants' argument.
*1318 "The question of joinder in a diversity case must be resolved in accordance with federal law." Tick v. Cohen, 787 F.2d 1490, 1493 (11th Cir.1986). Therefore, Federal Rule of Civil Procedure 19 governs the determination of whether a party is indispensable. Under Rule 19, where f joinder is feasible, a court must order joinder of a party if:
(A) in that person's absence, the court cannot accord complete relief among existing parties; or
(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
(i) as a practical matter impair or impede the person's ability to protect the interest; or
(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.
Fed.R.Civ.P. 19. "Rule 19 is not a mechanical formula . . . The Court is vested with substantial discretion in making the determination." Swerhun v. General Motors Corp., 141 F.R.D. 342, 344 (M.D.Fla. 1992). Applying Rule 19 to this case, I conclude as a matter of law that neither Goodwill or the architect are required to be joined. First, their absence does not hinder my ability to accord complete relief among the existing parties. Second, although both parties are aware of the litigation, neither is claiming an interest relating to the subject matter of the action. Finally, resolution of whether the Indemnity Agreement-an agreement that neither Goodwill nor the architect is a party to  allowed Liberty to release Aventura's claim will not leave an existing party subject to a risk of incurring inconsistent obligations.
The dispute in this case is between Liberty and Aventura. Although Goodwill and the architect will no doubt benefit from the, entry of summary judgment in favor of Plaintiff, this fact alone does not make them indispensable parties to this action. I would reach the same conclusion even if I had denied Plaintiffs motion for summary judgment because doing so would not deprive these parties of their rights to sue Liberty for damages incurred as a result of an invalid release.
C. Liberty's Right to Indemnification
As to indemnification for losses and costs incurred in connection with the Goodwill Bond, Defendants argue that Liberty is not entitled to it for the same reasons that it could not enter a release: it acted as a volunteer because Goodwill could not state a valid claim on the Goodwill Bond because it was in default of its contract for nonpayment, and because Liberty acted in bad faith. While I have already concluded that these arguments are without merit as they relate to Liberty's right to settle Aventura's claim, further discussion in relation to Liberty's right to indemnification is necessary.
As previously noted, courts have consistently upheld a surety's broad rights to indemnification as long as the surety acted in good faith. Therefore, a surety is entitled to reimbursement pursuant to an indemnity agreement for any payments made by it in a good faith belief that it was required to pay, regardless of whether any liability actually existed. Thurston, 528 So.2d at 129 ("A surety is entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a good faith belief that it was required to pay, regardless of whether any liability actually existed."); Employers Ins. of Wausau, 749 F.Supp. at 1103-1104 (same).
*1319 In the Wausau case, in interpreting provisions substantively identical to those in the Indemnity Agreement at issue in this case,[19] this Court found, that the Surety had the exclusive power to determine which bonds should be satisfied and that the only limitation was that it must do so in good faith. In doing so, it noted that "courts have consistently, held that the surety is entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a good faith belief that it was required to pay, regardless of whether any liability actually existed." Id. at 1103.
The Wausau Court also stated that unless the principal requested that the claim be litigated and posted collateral to cover the surety's potential liability, the surety had the exclusive right to determine whether to perform or pay a claim, on the bond. Id. Finally, the court held that the principal could not claim that the surety acted in bad faith in paying or settling the claim in order to forgo the litigation when the principal had not posted collateral. Id.
In Florida, "a party seeking indemnification must [only] establish that the settlement was made based on his potential liability to the plaintiff. A showing of `potential liability' is required because the indemnitee must not be a mere volunteer who has settled the underlying claim when there was no exposure to legal liability that obligated him or her to do so." Camp, Dresser & McKee, Inc. v. Paul N. Howard Co., 853 So.2d 1072, 1080 (Fla. 5th DCA 2003). The settling surety needs to show actual liability only if the indemnitor is not given notice and an opportunity to assume responsibility for the owner's claim. Id. Moreover, "where the indemnification claim is based on a written contract of indemnification, many courts recognize that a showing of potential liability is all that is required even if notice is not given." Id.; see also, Thurston, 528 So.2d at 129 ("A surety is entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a good faith belief that it was required to pay, *1320 regardless of whether any liability actually existed.") (citing Waterhouse v. McDevitt & Street Co., 387 So.2d 470 (Fla. 5th DCA 1980)).
In Waterhouse, the surety made payments to complete a project once the owner made a claim on the bond. Waterhouse, 387 So.2d at 472. The principal disputed the claim by asserting that the owner was in default. At the trial between the principal and the owner, the principal proved that the owner was in default so that the surety did not have any actual liability under the bond. Nonetheless, the court found that the surety's right to reimbursement was based solely on the indemnity agreement between the surety and the principal so that the surety was entitled to reimbursement despite the fact that no actual liability existed. Id. The indemnity agreement had a contractual right to reimbursement for payments made in a good faith belief that they were necessary or expedient. Because the principal did not prove that the surety acted in bad faith, it was entitled to reimbursement. Id.
Both because this case arises under a written indemnity agreement, and because there is no material dispute of fact that Aventura had notice of the claims, Liberty is entitled to indemnity upon a showing of potential liability under the Goodwill Bond. The record evidence establishes, without dispute, that Goodwill declared Aventura in default and demanded that Liberty complete the project. The record also establishes that Aventura had underbid the project by approximately $1.7 million. This undisputed evidence shows, as a matter of law, that Liberty objectively believed it could incur liability under the Bond. Furthermore, I have already concluded that Aventura has failed to establish that Liberty acted in bad faith. Finally, the Indemnity Agreement provides that evidence of any payments made by the surety in connection with an issued bond "shall be prima facie evidence of the fact and amount of the liability to the Surety." (Indemnity Agreement, DE 33-2 at § 2). Defendants do not dispute that Liberty has made payments totaling $2,755,936.51. Therefore, under the unambiguous terms of the Indemnity Agreement, Liberty is entitled to be reimbursed the $2,755,936.51 it has incurred in connection with the Goodwill Bond.
D. Injunctive Relief to Compel Indemnitors to Marshall Assets and Post Collateral
Liberty's Motion for Summary Judgment seeks injunctive relief in the form of a final decree of specific performance to compel Defendants to post collateral in the amount of $1,015,000 to cover its potential liability under the Pinecrest Bond and the. Jag-Air Claim on the Silver Lakes Bond. Neither the Florida Supreme Court nor the intermediary courts of appeals have directly addressed the question of whether a surety is entitled to specific performance to enforce its contractual rights to collateral. However, in Transamerica Premium Ins. Co. v. Cavalry Constr., Inc., 552 So.2d 225 (Fla 5th DCA 1989), the Florida Fifth District Court of Appeal generally recognized, without a discussion, that collateral security clauses may be enforced through equity. Id. at 226-27 ("While we agree that such [collateral security] clauses are enforceable in equity, the party seeking quia timet relief must clearly establish a basis for it."). In addition, case law nationwide has affirmed the availability of this relief in a manner consistent with the general principle of Florida law in this area stated by the Florida Fifth District Court of Appeal. *1321 See, e.g., Auto-Owners Ins. Co., No. 05-334-Orl-31, 2007 WL 676217; Safeco lns. Co. of Am. v. Schwab, 739 F.2d 431 (9th Cir.1984) ("[S]ureties are ordinarily entitled to specific performance of collateral security clauses. If a creditor is to have the security position for which he bargained, the promise to maintain the security must be specifically enforced"); Milwaukie Constr. Co. v. Glens Palls Ins. Co., 367 F.2d 964 (9th Cir.1966), citing 72 C.J.S., Principal and Surety § 308 (1951) (legal remedy of money damages was not adequate and specific performance was available to require indemnitors to deposit with, surety money or acceptable security equal to its established reserves); Feibus, 15 F.Supp.2d 579 (surety was entitled to specific performance in order to protect the surety's bargained-for rights to collateral security); United Bonding Ins. Co. v. Stein, 273 F.Supp. 929 (E.D.Pa.1967) (legal remedy for subsequent damages will not suffice when indemnitor refuses to voluntarily comply with surety's demands); U.S. Fid. & Guar. Co. v. Stanley Contracting, Inc., 303 F.Supp.2d 1169 (D.Or.2004) (court granted specific enforcement term requiring indemnitors to post security in order to protect the surety from future losses); BIB Construction, Inc. v. Fireman's Ins. Co. of Newark, NJ, 214 A.D.2d 521, 625 N.Y.S.2d 550 (N.Y. 1 App. Div. 1995) ("[D]amage resulting from failure to give security is not ascertainable, and the legal remedy is therefore inadequate"). The Restatement (Third) of Suretyship and Guaranty, § 21 cmts. i, j, k, also recognizes this right. I thus conclude that the Florida Supreme Court would specifically recognize a surety's entitlement to enforce its contractual rights to collateralization.[20]
Here, it is undisputed that on June 21, 2007, the Village of Pinecrest made a demand on the Pinecrest Bond; that Liberty's potential exposure is the full amount of the bond, $336,970.00, plus potential interests, costs, and attorneys' fees; that Liberty has made at least two demands for collateral; and, that, since the Defendants have not posted collateral, Liberty remains uncollateralized against any alleged loss with regard to the Village of Pinecrest claim in the amount of $440,000.00. It is also undisputed that on September 5 and 23, 2007, Liberty received a claim in the amount of $525,437.94.18 on Payment Bond No. 964-007-923, for the Silver Lakes School project, from Jag-Air; that on September 7, 2007 and again on October 4, 2007, Liberty demanded collateral in the amount of $575,000.00 as security against the potential liability on the Silver Lakes Bond, including potential claims for interest, costs and attorneys' fees; and that the Defendants have not posted any of the demanded collateral so that Liberty remains uncollateralized against its potential loss with regard to the Jag-Air Claim in the amount of $575,000.00.
Defendants argue that specific performance is inappropriate because Liberty has an adequate remedy at law. However, courts have found that a surety's loss of its right to collateralization cannot be adequately remedied through monetary damages. See, e.g., Feibus, 15 F.Supp.2d 579 (surety was entitled to specific performance in order to protect the surety's bargained-for rights to collateral security). Furthermore, cases discussing preliminary *1322 injunctions,[21] have held that a preliminary injunction is warranted to enforce a surety's rights if the principal is insolvent or secreting assets. See, e.g., Glades County v. Detroit Fidelity & Surety Co., 57 F.2d 449, 452 (5th Cir.1932).
Defendants also argue that injunctive relief should be denied because neither of the claims are valid. As to the Pinecrest Bond claim, Aventura argues that no potential exposure exists because the Village of Pinecrest failed to award the contract to Aventura in the time required and failed to unconditionally accept Aventura's bid as required. Aventura also alleges that Jag-Air's payment bond claim is not valid as no amounts are currently owing to Jag-Air because it terminated Jag-Air on September 5, 2007 at the express written direction of the School Board of Broward County, the owner of the Silver Lakes project, and because, pursuant to Aventura's contract with Jag-Air and Aventura's contract with School Board of Broward County, no further payments are owed until the work at Silver Lakes is finished. Despite these arguments, Defendants admit that they have not complied with Liberty's request for collateral. As was the case with the claim on the Goodwill Bond, these arguments fail.
I have already concluded that the Indemnity Agreement[22] provides Liberty with the right to be collateralized when, in it its sole judgment, it determines that potential liability exists. Aventura's conclusory statement that no potential liability exists is immaterial. The evidence unequivocally demonstrates that Liberty has received demands on these bonds, and has determined that its combined potential liability, is $1,015,000. For these reasons, Aventura's alleged defenses to the claims do not relieve it of its obligation to collateralize the surety.
Moreover, at the December 20 Hearing, when asked if Aventura was solvent, Defendants' counsel conceded that "Given the Goodwill job and the position that Liberty has put it in right now, Your Honor, I wouldn't consider it to be in good financial health." It was also brought to my attention that Defendants have failed to produce the company's financial statement despite having being ordered by the Magistrate Judge to do so. Finally, the undisputed facts establish that Aventura is engaging in a pattern of uncollateralization and ignoring its obligations under the Indemnity Agreement-despite multiple demands, it has failed to post collateral in connection with the Goodwill Bond, the Pinecrest Bond, and the Jag-Air Claim. These factors further support my conclusion that Liberty does not have an adequate remedy at law. Therefore, since *1323 specific performance is a recognized remedy for surety's seeking to enforce its contractual right to collateralization, a final decree of specific performance is necessary in this case to protect the surety's contractually acquired rights.
IV. Plaintiff's Renewed and Supplemental Emergency Motion for Temporary Restraining Order with Notice and for Preliminary Injunction
Plaintiff's Renewed and Supplemental Emergency Motion for Temporary Restraining Order with Notice and for Preliminary Injunction [DE 116] seeks to restrain Aventura from proceeding with pending arbitration proceedings between Aventura and non-party Goodwill. I held oral argument on the Motion on November 20, 2007, and reserved a decision on the Renewed Motion pending Oral Argument on Plaintiff's Motion for Summary Judgment. (See Order on Plaintiff's Renewed Motion, DE 134).
Previously, on May 10, 2007, Plaintiff sought to enjoin the first phase of the arbitration proceeding between Aventura and Goodwill.[23] I denied without prejudice Liberty's Motion for Preliminary Injunction explaining that the issue related to the Release between Plaintiff and Goodwill was a gateway issue to be considered by the AAA arbitration panel. (See Order dated June 1, 2007, DE 77). I also indicated that based on the result of the AAA proceeding, Plaintiff may re-file its Motion for Preliminary Injunction. Thereafter, the arbitration panel held a hearing and issued an Interim Award concluding that although the Indemnity Agreement assigned Aventura's claim to Liberty, the release was invalid because Liberty did not really need to procure the release in order to mitigate its exposure under the Goodwill Bond.
Plaintiff has now filed a Renewed Motion seeking to "restrain AVENTURA . . ., and consequently the American Arbitration Association (`AAA'), from proceeding with that certain pending arbitration proceeding styled Aventura Engineering & Construction Corp. v. Goodwill Industries of Southern Florida, Inc., AAA Case No. 32-110-Y-00500-06 (the `Arbitration Action')". (Renewed Motion, DE 116 at 1). The arbitration panel has set a final hearing on the Arbitration Action for January 28, 2008.
As explained in my previous orders, while the parties extensively briefed this matter as a motion for a traditional injunction, I interpreted Plaintiff's Motion for Preliminary Injunction as a motion for an injunction under 28 U.S.C. § 1651(a), i.e., the All Writs Act, not a motion for a traditional injunction. Despite my previous orders, Plaintiff continues to brief its Renewed Motion as a motion for a traditional injunction. Once again, I will interpret the motion as seeking an injunction under the All Writs Act, which both parties have conceded that I have the power to do.
The All Writs Act states in relevant part that "[t]he Supreme Court and all courts *1324 established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The Eleventh Circuit has described the All Writs Act as "a codification of the federal courts' traditional, inherent power to protect the jurisdiction they already have, derived from some other source." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1100 (11th Cir.2004) (citing Procup v. Strickland, 792 F.2d 1069, 1074 (11th Cir. 1986) (en banc) ("Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions.")).
The All Writs Act allows a court to "safeguard not only ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments". Id. at XXXX-XXXX (citing Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir.1993) ("In addition, courts hold that despite its express language referring to `aid . . . of jurisdiction,' the All-Writs Act empowers federal courts to issue injunctions to protect or effectuate their judgments.")); see also ITT Community Dev. Corp. v. Barton, 569 F.2d 1351, 1359-60 (5th Cir.1978) (noting that the All Writs Act permits a district court to issue any order "necessary to enable the court to try the issues [in a pending case] to final judgment" and "develop the material issues and to bring them to a complete resolution"). A writ under this act may be granted when "it is calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it, and not only when it is necessary in the sense that the court could not otherwise physically discharge its duties." Klay, 376 F.3d at 1100 (citing Adams v. United States, 317 U.S. 269, 273, 63 S.Ct. 236, 87 L.Ed. 268 (1942) (internal quotations omitted)). In addition to the immediate parties to a proceeding, these writs may be directed to "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." Id. (citing United States v. N.Y. Tel. Co., 434 U.S. 159, 174, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)).
An All Writs Act injunction need not be predicated upon some cause of action. Id. Instead, these injunctions are predicated "upon some other matter upon which a district court has jurisdiction. Thus, while a party must `state a claim' to obtain a `traditional' injunction, there is no such requirement to obtain an All Writs Act injunction  it must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by some action or behavior." Id. When considering whether to grant an All Writs Injunction, the Court does not review the four factors required for a traditional injunction. Id.
Defendants argue that there is no basis for the court to issue an All Writs Act Injunction, and that there has been no change in circumstances since I previously denied Plaintiffs initial request for a preliminary injunction. I disagree. Since denying the motion for preliminary injunction, the arbitration panel concluded that Liberty's release of Aventura's claim was invalid. In addition, I have now issued an order granting Liberty's Motion for Summary Judgment seeking a judicial declaration that it had the right to release Aventura's claim. This order contradicts the arbitration panel's decision. Any further *1325 decisions by the arbitration panel threaten my ability to try the issues before me and to effectuate my judgments. Moreover, at the June 1, 2007 hearing on Plaintiff's Motion for Preliminary Injunction, both parties agreed that if the arbitration panel decided the release was invalid, as it subsequently did, the All Writs Act gave me, the power to enjoin future arbitration proceedings and to stay the effect of any decision in that regard. (See June 1, 2007 Hearing Transcript).
Since I have granted summary judgment in favor of plaintiff on the issue of whether it had the right to release Aventura's claim against Goodwill, I find it necessary to issue an All Writs Act Injunction to enjoin the arbitration proceedings between Aventura and Goodwill in order to protect my jurisdiction. While neither the arbitration panel nor Goodwill are parties to this case, the All Writs Act allows me to enjoin "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice . . ." Klay, 376 F.3d at 1100. For these reasons, Plaintiff's Renewed Motion seeking to enjoin the Arbitration Action is granted.
V. Plaintiff's Motion for Preliminary Injunction [DE 113]
On September 5 and 23, 2007, Liberty received a claim from Jag-Air in the amount of $525,437.94,18 on Payment Bond No. 964-007-923, for the Silver Lakes School project. On two separate occasions demanded collateral from Defendants in the amount of $575,000.00 as security against the potential liability on the Silver Lakes Bond, including potential claims for interest, costs and attorneys' fees. Rather than post the demanded collateral, Defendants dispute the validity of these claims.
On November 6, 2007, Plaintiff filed a Motion for Preliminary Injunction: (1) seeking disgorgement of payments to Aventura from the School Board of Broward County, Florida, in the amount of $163,628.00 in relation with the Silver Lakes Bond; and, (2) requiring Defendants to post collateral in the additional amount of $411,372.00 to cover the potential losses and expenses associated with the pending Jag-Air's pending claim on the Silver Lakes Payment Bond. This amount, totaling $575,000.00, corresponds to the same claim for collateral sought in Plaintiffs Motion for Summary Judgement. Specifically, in its summary judgment motion, Plaintiff sought a final decree of specific performance requiring that Defendants post collateral in the amount of $1,015,000.00 to secure Plaintiff against potential liability on the Village of Pinecrest Bond and the pending claim by Jag-Air Mechanical in connection with the Silver Lakes School Payment Bond. Of this amount, $575,000.00 were sought in relation to the Jag-Air Claim.
As explained by Plaintiff during the December 20 Hearing, if summary judgment is entered awarding a final decree of specific performance on Plaintiff's request for collateral, this Motion for Preliminary Injunction is moot: Plaintiff may not be awarded the same remedy, albeit under different theories, twice. Because I have granted a decree of specific performance requiring Defendants to post collateral, including a sum of $575,000 to cover Plaintiff's potential exposure in connection with the Jag-Air claim on the Silver Lakes Bond, plaintiff's motion for preliminary injunction is denied as moot.

IV. Conclusion
Having reviewed the motions, relevant case law and pertinent parts of the record, *1326 and being otherwise duly advised in the premises, it is hereby
ORDERED AND ADJUDGED:
1. Plaintiff's Motion for Summary Judgment [DE 101] is GRANTED.
2. Plaintiff is awarded a monetary judgment in the amount of $2,755,936.51 to indemnify Plaintiff for losses and costs incurred in connection with the Goodwill Bond. The Court reserves jurisdiction to determine Plaintiff's entitlement to recover interest, additional costs, and attorneys' fees in connection with the Goodwill Bond. The Clerk of the Court shall enter judgment consistent with this Order.
3, Defendants are required to post collateral in the amount of $1,015,000.00 to secure Plaintiff against potential liability on the Pinecrest Bond and the Jag-Air Claim on the Silver Lakes Bond within twenty (20) days from the date of this Order.[24]
4. Plaintiff's Renewed and Supplemental Emergency Motion for Temporary Restraining Order with Notice and for Preliminary Injunction [DE 116] is GRANTED.
5. An All Writs Act Injunction enjoining Aventura and the AAA (including the subject Arbitration Panel) from proceeding with the pending arbitration proceeding styled Aventura Engineering & Construction Corp. v. Goodwill Industries of Southern Florida, Inc., AAA Case No. 32-110-Y-00500-06 is issued. Plaintiff is instructed to serve a copy of this Order on the AAA, and on Arbitrator Barry D. Green who is personally directed to comply with this Order.
6. Plaintiff's Motion for Preliminary Injunction [DE 113] is DENIED AS MOOT.
7. This case is ADMINISTRATIVELY CLOSED, although the Court retains jurisdiction to enforce the orders entered.
8. All other pending motions are DENIED AS MOOT and all hearings are CANCELLED.
DONE AND ORDERED.
NOTES
[1] Both parties, in their respective statements of facts, include legal conclusions and argumentative statements. For example, Defendants state that: "The Takeover Agreement is merely one of several writings that confirmed Liberty's waiver, as well as all of Liberty's actions until it sued Defendants and executed a release." (DE 150 at ¶ 53); and, "Defendants dispute Liberty's alleged damages because as previously noted contractual defenses exist against the Goodwill, Village of Pinecrest and Jag-Air claim. With respect to the Goodwill claim, the only claim in which Liberty has alleged it made payments, Liberty's actions were as a volunteer." (Id. at ¶ 55). These conclusory and argumentative statements do not defeat a motion for summary judgment. See McKenzie v. Citation Corp., No. 05-0138, 2007 WL 1424555, *6 (S.D.Ala. May 11, 2007) ("Conclusory allegations without specific supporting facts have no probative value.") (quoting Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir.2000)).
[2] Copies of the Indemnity Agreement, the Goodwill Performance Bond, the Takeover Agreement, and the Liberty-Goodwill Settlement Agreement have been filed with the Court. I have reviewed these agreements in their entirety and will include portions, where pertinent, in this Order.
[3] The Indemnitors argue that they did not need to provide collateral under the terms of the bonds because Goodwill was in default. This is a legal conclusion and not a disputed fact. More importantly, the Indemnitors admit, and the record shows, that they never posted the demanded collateral. (DE 150 at ¶ 47). The Indemnitors also argue that "Liberty never requested collateral in response Aventura's request that Liberty deny Goodwill's claim because Liberty proposed as an alternative that it complete the project and reserve Aventura's right to arbitrate whether it was wrongfully terminated; Aventura agreed to Liberty's proposal and thus there was no requirement that it post collateral." (Id. at ¶ 49). Contrary to Defendants' argument, the record establishes that Liberty made several written demands for collateral before and after it entered into the Takeover Agreement. (See DE 104 at Ex. 20-24, 27, 29).
[4] Defendants argue that the Goodwill performance bond claim is not a valid claim because Goodwill was in default of its contract for failure to pay the April and May pay applications, and because Goodwill failed to provide the contractually required seven day notice provision. However, Defendants do not dispute 19, 2006 Goodwill terminated Aventura's contract for an alleged default and that Goodwill made a demand on Liberty to perform the contract. (See Arbitration Testimony and Exhibits Thereto of James D. Gibson, DE 104 at 107). Moreover, whether" Goodwill was in default is a legal conclusion for the Court to decide.
[5] Defendants have submitted additional facts in their statement. However, these "additional facts" are either not material or not supported by evidence in the record. Defendants first claim that Liberty admitted that it never conducted any investigation after receiving Goodwill's June 19, 2006 demand upon the bond. (DE 150 at ¶ 34). However, the record demonstrates that prior to receiving the June 19., 2006 letter, Liberty had conducted an investigation of Aventura's books and records and provided Aventura a detailed report of their findings. (DE 143 at ¶ 9, & n. 7; DE 107 at Ex. 10). In addition, after receiving the June 19, 2006 letter, Liberty met with Aventura to discuss the parties' positions and proposed completion of the project as a means to mitigate damages. (DE 151 -2 at Ex. 4). Through this Cooperative agreement, Liberty had access to Aventura's records, Aventura's staff, and Aventura's knowledge of the project. (Id.). While this might not have been a formal investigation, Defendants have failed to established that Liberty did not conduct "any" investigation of the situation. At the very least, Defendants have failed to establish that Liberty "admitted" that it did not conduct any investigation. In fact, the very testimony that Defendants, rely on to support this statement, shows otherwise. (Id.).

Similarly, the record does not show that "Liberty admitted it did not consider or investigate any of the points raised in Aventura's June 20th letter, and did not consider the bond requirements either." (DE 150 at ¶ 35). Rather, Mr. Gibson testified that Liberty and Aventura agreed to mitigate the damages in this case and that it was not necessary to investigate every alleged breach of Goodwill. (DE 151-2 at Ex. 1, 5). Moreover, whether Liberty investigated any or every alleged breach is only material if Liberty was under an obligation to do so and, as discussed further below, it was not.
Finally, Aventura alleges that "Liberty admitted that even after it received Aventura's counsel's February 20, 2007 letter requesting that Liberty not settle Aventura's claim that it did not take any action to question Aventura or its counsel regarding the details of the claim." (DE 150 at ¶ 37). The evidence shows that despite Liberty's requests, Aventura did not, provide collateral to Liberty. Therefore, Aventura did not have the right to ask Liberty not to settle its claim.
[6] Aventura alleges that after receiving the June 20, 2006 letter requesting that Liberty deny Goodwill's claim, Liberty did not ask for Avenutra to provide collateral. (DE 150 at ¶ 21). To support this allegation, Aventura cites to Ms. Lopez's conclusory statements. Ms. Lopez's conclusory and argumentative statements cannot defeat a motion for summary judgment. See McKenzie, No. 05-0138, 2007 WL 1424555 at*6. Moreover, the record is clear that Liberty continued to demand collateral on the Goodwill Bond up to the time it filed this action. (DE 104 at Ex. 20-24, 27, 29). In addition, whether Goodwill was in default is not issue before me. What matters in this case are the rights of Liberty and Aventura in relation to the Indemnity Agreement and the issued bonds.
[7] Defendants argue that the Performance Bond provides at Section 3 that the Surety's obligation shall not arise if the owner is in default and that Liberty has conceded this point. (DE 150 at ¶ 13). Defendants also argue that the performance bond provides at section 4 that the surety is not to take action until the Owner has satisfied the conditions of Section 3, which requires the Owner not be in default. (Id. at ¶ 14). Interpretation of the Indemnity Agreement, the Performance Bond and other agreements among the parties are legal questions for the Court. In addition, nothing in the record indicates that Liberty has conceded these points. In fact, the testimony that Defendants point to in support of their statements show that when asked whether the bond stated that the Surety's obligation shall not arise if the owner is in default, Mr. Gibson responded: "No. I think we can't agree the bond says that." (August 29, 2007 Gibson Testimony, pp. 131-132, DE 151-2).
[8] Defendants allege that Aventura initially opposed this action and that it wanted to provide collateral to have Liberty deny the claim based upon Goodwill's being in default of the contract and having wrongfully terminated Aventura. (DE 150 at ¶ 24). No evidence in the record supports this conclusory statement. See McKenzie, No. 05-0138, 2007 WL 1424555 at *6 ("Conclusory allegations without specific supporting facts have no probative value.").
[9] Defendants allege that Liberty failed to provide proof of its numbers and refused Aventura's request that it be allowed to attend meetings with Liberty and Goodwill so that Aventura could determine whether Liberty was being asked to or was performing work that was extra and beyond the scope of Aventura's contract. However, as already discussed, the record shows that Liberty had previously provided detailed proof of the amounts requested as collateral. (See DE 143 at ¶ 10; DE 107 at Ex. 12 & 13).
[10] Defendants add that Goodwill did not insist upon the release from Aventura, and that Liberty provided the release because it believed it owned the claim and could do with it whatever it wanted. (DE 150 at ¶ 41). Even if this assertion is undisputed, it is immaterial. As discussed further below, if Liberty had the right to release Aventura's claim, the reason why it chose to do so, as long as it was not done in bad faith, is irrelevant.
[11] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.
[12] The following were among the provisions the Harlandale Indep. School Dist. Court found to be industry standard:

ASSIGNMENT  THIRD: The Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any, and all of the paragraphs of this Agreement . . . (a) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds . . .
SETTLEMENTS  THIRTEENTH: The Surety shall have the, right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, unless the Contractor and the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.
Comparing these provisions to the ones in this case, I conclude that the only differences are minor and stylistic.
[13] The parties have not submitted the Construction Contract for the Goodwill Project.
[14] I also note that the Amendments Provision provides that the "Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written amendment to form a part thereof." (Indemnity Agreement, DE 33-2 at § 20). Defendants concede that the bonds were not attached by reference to the Indemnity Agreement and the Indemnity Agreement does not contain neither an incorporation or merger provision. (December 20, 2007 Hearing Transcript). Additionally, Defendants have not provided any record evidence establishing a material issue of fact that the Indemnity Agreement has been properly modified. The record evidence is to the contrary. Therefore, the terms of the Indemnity Agreement govern the rig its and obligations of the parties, and the language of the performance bond do not limit Liberty's rights.
[15] In fact, it seems that Liberty has already experienced this lose-lose situation. At the December 20 Hearing, Plaintiff's counsel stated that liability on the Pinecrest Bond has not arisen from Liberty's settlement of the Pinecrest Bond over Aventura's objections. Liberty agreed with Aventura that defenses existed to the Pinecrest Bond claim and denied it. As a result, Liberty has been sued by the owner. The collateral Liberty seeks is to cover the potential liability it faces if it losses the lawsuit Despite Liberty's denial of the Pinecrest Bond, Aventura has not indemnified it for its loses.
[16] The provisions at issue in Harlandale are quoted supra, n. 12.
[17] The Harlandale decision is consistent with Florida's rules of contract construction and with Florida's recognition of the importance of sureties. Therefore, I conclude that the Florida Supreme Court would adopt the reasoning in Harlandale.
[18] Waiver is an affirmative defense. Coastal Caisson Drill Co. v. Am. Casualty Co., 523 So.2d 791, 794 (Fla. 2nd. DCA 1988) (recognizing waiver as an affirmative defense). Nonetheless, in a summary judgment context, the moving party must disprove the affirmative defenses or establish that they are insufficient as a matter of law. Stop & Shoppe Mart, Inc. v. Mehdi, 854 So.2d 784, 786 (Fla. 5th DCA 2903). The movant may not merely deny the affirmative defenses. Id.
[19] Pertinent parts of the indemnity agreement at issue in the Wausau case provided:

The Surety shall have the exclusive right to decide and determine whether any claim, liability, suit, or judgment made or brought against the Surety or the Indemnitors or any one of them on any such bond shall or shall not be paid, compromised, resisted, defended, tried, or appealed, and the Surety's decision thereon, if made in good faith shall be final and binding upon the Indemnitors, unless the Indenmitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered, or that may be rendered, with interests, costs, expenses and attorneys fees, including those of the Surety. An itemized statement of payments made by the Surety for any of the purposes specified herein, sworn to by an officer of the Surety, or the voucher, or vouchers for such payments, shall be prima facie evidence of the liability of the Indemnitors to reimburse the Surety for such payments with interest.
The Indemnitors will indemnify the Surety against any and all liability, loss, costs, damages, fees of attorneys and other expenses which the Surety may sustain or incur by reason of, or in consequence of the execution of such bonds and any renewal, continuation or successor thereof, including but not limited to, sums paid or liabilities incurred in settlement of, and expenses paid or incurred in connection with claims, suits or judgments under such bonds, expenses paid or incurred in enforcing the terms hereof, in procuring or attempting to procure release from liability, or in recovering or attempting to recover losses or expenses paid or incurred, as aforesaid.
I have compared these provisions with the ones from this case, and conclude that there are no material differences in their substance.
[20] Alternatively, Liberty seeks to enforce its common law rights to, exoneration and quia timet. However, since Liberty's right to collateral arises under the indemnity agreement, and I have concluded that a final decree of specific performance is available, I do not need to consider Liberty's alternative arguments.
[21] Although cases discussing preliminary injunctions are inapposite since Plaintiff is seeking a final decree of specific performance, I will address. Defendants' arguments as to the adequacy of specific performance when Liberty may have an appropriate remedy at law.
[22] As already noted, the Indemnity Agreement provides that:

"[t]he Indemnitors shall exonerate, hold harmless, indemnify, and keep indemnified the Surety from and against any and all losses . . . and expenses whatsoever kind or nature . . . which the Surety may sustain or incur . . . (2) by having executed or procured the execution of any Bond . . . "
"[i]f the Surety determines, in its sole judgment, that potential liability exists for . . . which the Indemnitors and Principals will be obliged to indemnify the Surety under the terms of this Agreement . . . the Indemnitors . . . shall deposit with the Surety, promptly upon demand, a sum of money equal to an amount determined by the Surety or collateral security of a type and value satisfactory to the Surety . . . "
[23] As thoroughly discussed in previous Orders, Aventura initiated arbitration proceedings against Goodwill alleging that Goodwill had improperly terminated Aventura. In response, Goodwill alleged that Liberty had settled all of Aventura's claims, arising under the construction contract against Goodwill. The AAA decided to bifurcate the issues and announced that it would first decide the validity of the assignment, and release of Aventura's claims by Liberty.
[24] While I note that Plaintiff may seek relief from this Court should Defendants fail to abide with the requirements of this Order, I need not decide at this time what relief will be appropriate should that circumstance arise.